## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| ANITA BROWN, | : | Case No. 3:14-cv-451 |
| | : | |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | |
| vs. | : | Chief Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATION[1]

This Social Security disability benefits appeal is before the Court on Plaintiff's statement of errors (Doc. 8), the Commissioner's memorandum in opposition (Doc. 11), the Plaintiff's reply (Doc. 12), the administrative record (Doc. 7), and the record as a whole.  At issue is whether the Administrative Law Judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore not entitled to a period of disability and disability insurance benefits ("DIB"), nor Supplemental Security Income ("SSI").  (*See* Doc. 7, PageID ## 71-90 (the "ALJ's decision")).

## I.  INTRODUCTION

On October 1, 2012, Plaintiff Anita Brown protectively filed applications for a period of disability and DIB, as well as SSI, alleging disability beginning April 13, 2011.  (Doc. 7, PageID ## 299-300).  Plaintiff alleged she was unable to work due to the

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendation.

following impairments: cervical radiculopathy, carpal tunnel, epicondylitis, low blood pressure, severe headaches, depression, anxiety, and tachychardia.  (*Id.* at 303).  Her claims were denied initially and on reconsideration.  (*Id*. at 71).

Plaintiff requested a hearing before an ALJ, which was held on April 30, 2014. (Doc. 7, PageID # 64, 71).  Plaintiff and a vocational expert ("VE") testified, with Plaintiff's counsel in attendance.  (*Id.*)

On July 23, 2014, ALJ Emily Ruth Statum issued an unfavorable decision, finding that Plaintiff had not been under a disability as defined in the Social Security Act, and was therefore not entitled to a period of disability, DIB, or SSI.  (*Id.* at 90).  Although finding that Plaintiff was not capable of performing her past relevant work, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[2] to perform a reduced range of light, unskilled work.  (*Id.* at 78).  Based on Plaintiff's age, education, work experience, and RFC, the ALJ found that there were a significant number of jobs in the national and regional economy that Plaintiff could perform.  (*Id.* at 88-90).  Therefore, the ALJ concluded that Plaintiff was not disabled.  (*Id.* at 90).

The decision became final and appealable on November 13, 2014, when the Appeals Council denied Plaintiff's request for review.  (*Id*. at 56-59).  Plaintiff then properly commenced this action for judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g).

---

[2] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

At the time of the hearing, Plaintiff was 48 years old. (Doc. 7, PageID # 88). She completed high school in 1984 and had some job training in the food service industry shortly thereafter. (*Id.* at 304). Plaintiff had no other specialized job training, and had not attended any trade or vocational schools. (*Id.*) The ALJ determined that Plaintiff had past relevant work as a production helper, lead worker, shipping and receiving clerk, stock clerk, and machine operator. (*Id.* at 88). However, based on the VE's testimony, the ALJ found that Plaintiff's exertional limitations precluded her from returning to her past relevant work. (*Id.*)

The ALJ's "Findings," which represent the rationale of her decision, are as follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since April 13, 2011, the alleged disability onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: moderate central canal stenosis at C4-C5, C5-C6 and C6-C7 with flattening of the right hemicord from protruding osteophytes at C5-C6 and C6-C7; a broad based central disc protrusion at C2-C3; status-post anterior cervical discectomy and cervical fusion from C4-C5 to C6-C7 in November 2011; cervical myofascial pain syndrome; osteoarthritis of the left acromioclavicular join; left shoulder rotator cuff tendinitis with partial tear on the left; ulnar neuropathy at the right elbow; epicondylitis on the left requiring surgery in January 2008; obesity, asthma, anxiety; and depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

3

5. After careful consideration of the entire record … the claimant has the residual functional capacity to perform a reduced range of light work as defined at 20 CFR 404.1567(b) and 416.967(b), which would require lifting and/or carrying 20 pounds occasionally and 10 pounds frequently, sitting about 6 hours in an 8 hour workday, standing and/or walking about 6 hours in an 8 hour workday, with no limitations for pushing and/or pulling, except that the individual cannot climb ladders, ropes or scaffolds, can occasionally stoop, kneel, crouch or crawl, can occasionally reach overhead bilaterally, with the need to avoid dusts, fumes, or environmental contaminants, and is limited to performing unskilled work that is simple and routine.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 31, 1965 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 13, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Doc. 7, PageID ## 73-90). In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Act and was therefore not entitled to a period of disability, DIB, or SSI. (*Id.* at 90).

4

On appeal, Plaintiff argues that: (1) the ALJ failed to follow the Social Security Administration's own regulatory requirements in weighing the medical source opinions which therefore denotes a lack of substantial evidence and an error as a matter of law; (2) the ALJ failed to properly evaluate Plaintiff's credibility, pain, and symptoms, pursuant to the Social Security Administration's own rulings and regulations and Sixth Circuit case law; and (3) the Commissioner failed to carry her Step Five burden.  (Doc. 8).

## II.  STANDARD OF REVIEW

The Court's inquiry on appeal is limited to whether the ALJ's non-disability finding is supported by substantial evidence and whether the correct legal standard was applied.  42 U.S.C. § 405(g); *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010).  Substantial evidence is more than a "mere scintilla" but less than a preponderance of the evidence.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").  In reviewing the ALJ's decision, the district court must look to the record as a whole and may not base its decision on one piece of evidence while disregarding all other relevant evidence.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  Even if the district court "might have reached a contrary conclusion of fact, the [ALJ's] decision must be affirmed so long as it is supported by substantial evidence."  *Kyle*, 609 F.3d at 854-855 (citing *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604-05 (6th Cir. 2009)).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  That is, he must present

5

sufficient evidence to show that, during the relevant time period, he was unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment, or combination of impairments, which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A).

### III.  BACKGROUND

The relevant facts, as reflected in the record, are as follow:[3]

### A.  Relevant Medical Evidence

#### 1.  *Physical Impairments*

##### a.  Phillip Edwards, D.O.

On January 29, 2008, prior to the alleged onset date, Phillip Edwards, D.O. performed an excision of the fascia of Plaintiff's left lateral elbow, and ultimately diagnosed chronic left lateral epicondylitis (*i.e.*, tennis elbow).[4]  (Doc. 7, PageID ## 768-69).  According to Plaintiff, Dr. Edwards instructed her not to lift or pull anything following surgery, which restriction was lifted after four years.  (*Id*. at 581).

##### b.  Rabindra Kitchener, M.D.

On May 15, 2011, Rabindra Kitchener, M.D., began treating Plaintiff.  (Doc. 7, PageID # 581).  Plaintiff told Dr. Kitchener that she had reinjured her upper left extremity two months after Dr. Edwards' restrictions were lifted.  (*Id.*)  As a result of the

---

[3] Having thoroughly reviewed the administrative record, the Court finds that a complete recitation of all facts in this case is unnecessary and, therefore, restricts its statement of the facts to those relevant to Plaintiff's alleged errors.

[4] Lateral Epicondylitis (commonly referred to as 'tennis elbow'), "is an inflammation of the tendons that join the forearm muscles on the outside of the elbow," caused by overuse, such as with repetitive motion.  OrthoInfo, available at: orthoinfo.aaos.org/topic.cfm?topic=a00068.

new injury, Plaintiff complained of bilateral numbness in her hands, weakness in upper

extremities, and pain in her left elbow and shoulder.  (*Id*.)   Following an examination,

Dr. Kitchener noted that some of Plaintiff's symptoms were suggestive of cervical strain,

epicondylitis, and possibly carpal tunnel.  (*Id*. at 581-582).

Dr. Kitchener ordered an EMG and nerve conduction study of the bilateral upper

extremities, as well as an MRI of the cervical spine, which were completed on May 23,

2011 and May 27, 2011, respectively.  (*Id*. at 575).  The EMG and nerve conduction

study showed evidence of a right cervical nerve root injury involving the C5-6 cervical

nerve roots, but no evidence of cervical radiculopathy, peripheral neuropathy, myopathy,

or any other entrapment neuropathy.  (*Id.*)  The MRI revealed only mild disc space

narrowing at C5-6 and C6-7.   (*Id.* at 572).  As EMG and MRI results failed to explain

her symptoms, Plaintiff was referred to a spinal surgeon.  (*Id.* at 571-72, 575).

c.  William Tobler, M.D.

Plaintiff was seen by spinal surgeon, William Tobler, M.D., who performed an

anterior cervical discectomy and fusion at C4-5, C5-6, and C6-7 on November 28, 2011.

(*Id*. at 385-389, 816-823).  During a post-operative appointment two weeks after her

surgery, Plaintiff reported resolution of her left arm radiculopathy and paresthesias, and

was said to be "doing well."  (*Id.* at 393).  During a follow-up in March 2012, Plaintiff

stated that her range of motion had improved since starting physical therapy, and that her

left-sided radiculopathy had "nearly completely resolved."  (*Id.* at 403).  At her one-year

post-operative follow-up in November 2012, Dr. Tobler noted that Plaintiff's left-sided

radiculopathy had "completely resolved," and Plaintiff complained only of soreness and

7

tenderness in the right upper paracervical muscles, which was attributed to muscle strain. (*Id.* at 923).

> d. <u>Stephen Duritsch, M.D.</u>

In March 2012, Plaintiff began treatment for neck and arm pain with Stephen Duritsch, M.D., at RehabMed Associates. (Doc. 7, PageID # 415). Dr. Duritsch's notes indicate that, according to Plaintiff, the pain "makes it hard for her to flex her neck[,] extend[] neck or rotate to the right," however, "she denied any weakness in the upper limbs." (*Id.*) Dr. Duritsch noted that Plaintiff was "negative" for fatigue, back pain, joint swelling, gait problems, weakness, numbness, and psychiatric/behavioral issues. (*Id.* at 417).

Dr. Duritsch wrote that Plaintiff showed only localized tenderness on her right side and mild tenderness on the left, that Plaintiff's strength was "5/5 in the bilateral upper limbs … [s]houlder impingement signs [were] negative … [and there was] no evidence of localized shoulder pathology." (*Id.* at 418). He opined that Plaintiff "has localized myofascial findings as her primary pain generator," and that he concurs with Dr. Tobler's impression that "[Plaintiff] needs continuous appropriate physical therapy for myofascial release and massage."[5] (*Id.*) Dr. Duritsch further opined that Plaintiff's "disability management is going to be difficult," because she would not see her

---

[5] Myofascial pain syndrome is a condition in which, "pressure on sensitive points in [the] muscles (trigger points) causes pain in seemingly unrelated parts of [the] body … Myofascial pain syndrome typically occurs after a muscle has been contracted repetitively … [which] can be caused by repetitive motions used in jobs or hobbies or by stress-related muscle tension." Myofascial Pain Syndrome, <u>Mayo Clinic</u>, available at: http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/definition/con-20033195.

neurosurgeon until June 5, 2012, but would lose her job and benefits on April 16, 2012.

(*Id.*)  He concluded that, "[i]n the long run, she'll likely still maximize[] out at a

sedentary type job as she will not return to her job where she is lifting 25 pound[]

bearings."  (*Id.*)

During a follow-up appointment on August 8, 2012, Dr. Duritsch noted that

Plaintiff denied weakness in her arms, and but for "a bit of tenderness of the dorsum of

the wrist … upper limb range of motion is normal."  (*Id.* at 420-21).  He stated that unless

Plaintiff considered attending physical therapy, she did not need to return for a follow-up

appointment, as he had nothing further to offer her.  (*Id.* at 421).  Notably, Dr. Duritsch

provided the following "Assessment Discussion":

> I have rewritten her restrictions.   Restrictions are in all likelihood
> permanent.  Hopefully she can find a job with her previous employer within
> [these] restrictions.  Otherwise we [can] look elsewhere.  It may be helpful
> [to] her from a psychological standpoint to return to gainful employment as
> she has a strong work ethic in the past but has been off work for so long
> [due] to her surgery.  I encouraged her [to] return to restricted work as soon
> as possible.

(*Id.*) (Emphasis added).

On August 18, 2012, Dr. Duritsch completed a "Return to Work

Recommendations" form detailing Plaintiff's physical restrictions, which he opined to

include: only occasional lifting, carrying, pushing, and pulling no more than ten pounds;

no repetitive neck extending or twisting; no climbing, but occasional use of stairs; only

occasional reaching above with shoulders; only occasional pinching, pressing, fine

manipulation, and gross grasping with either hand; and only occasional typing.  (*Id.* at 532).[6]

On November 13, 2012, Plaintiff returned to Dr. Duritsch, complaining of neck pain.  (*Id.* at 433).  Dr. Duritsch noted that it had been almost a year since Plaintiff's surgery (performed by Dr. Tobler), but that her condition had not improved in the last six months.  (*Id.* at 433-34).  He commented that Plaintiff kept her neck flexed, that lateral rotation was absent, and that she was "quite fixed and rigid."  (*Id.* at 434).  Dr. Duritsch recommended that Plaintiff accelerate her follow-up appointment with Dr. Tobler.  (*Id.*)  Plaintiff complied with the recommendation and went to Dr. Tobler before returning to Dr. Duritsch on November 21, 2012.  (*Id.* at 456-59).  Dr. Duritsch's notes from the November 21 visit indicate that Plaintiff's EMG showed no evidence of a myopathy, radiculopathy, plexopathy, or motor sensory polyneuropathy, and only mild right ulnar nerve injury in the elbow but no evidence of other isolated nerve injury.  (*Id.* at 457).

On March 21, 2013, Plaintiff returned to Dr. Duritsch with ongoing neck pain and tingling.  (*Id.* at 464).  Dr. Duritsch noted that strength in Plaintiff's bilateral upper limbs was "5/5," and opined, as he had in the past, that Plaintiff "has ongoing myofascial tenderness and tightness for which she could benefit from physical therapy."  (*Id.* at 465-66).  Further, he wrote that Plaintiff had not yet found a job but that she "regularly does jobs at home" to keep herself active, though "[s]he is limited due to her neck pain and

---

[6] In an effort to clarify any inconsistencies regarding the dates of Dr. Duritsch's opinions, the Court would note that Dr. Duritsch's handwritten assessments, including the two "Return to Work Recommendation" forms, appear to be dated in a day/month/year format.

tingling [from] being continuously active at home." (*Id.* at 465).  However, Dr. Duritsch also noted that Plaintiff had been found ineligible for DIB and SSI, and opined that "[b]ased on her current level of activity and her exam today … [s]he is capable of sedentary activity, but cannot perform this activity for an 8 hour day." (*Id.* at 466).

On August 5, 2013, Dr. Duritsch noted that Plaintiff exhibits decreased range of motion and tenderness in her cervical back.  (*Id.* at 760).  However, he wrote that she was negative for back pain, joint swelling and gait problems.  (*Id.*)  Further, Plaintiff showed impingement signs on the left side only, but still had normal range of motion in her left shoulder; no swelling in the upper limbs; and normal strength and reflexes.  (*Id.*)  Additionally, Plaintiff had rotator cuff tendinopathy with a partial tear.  (*Id.* at 761).  However, Dr. Duritsch noted no rotator cuff weakness and, since the tear was partial rather than complete, he recommended only physical therapy.  (*Id.* at 760-61).

With little variation, all subsequent notes from Dr. Duritsch, until the last recorded in June 2014, state that Plaintiff shows some tenderness and decreased range of motion of the cervical spine and left shoulder, positive impingement signs on the left, and some decreased sensation of the hands.  (*Id.* at 961-87; 1072-83; 1111-14).  However, the notes also consistently state that Plaintiff has no back pain, joint swelling, or gait problems; no weakness or atrophy; normal strength and reflexes; no swelling in upper bilateral extremities; and no issues with pain or limited range of motion on the right side.  (*Id.*)

In June 2014, Dr. Duritsch completed a second "Return to Work Recommendations" form on Plaintiff's behalf.  (*Id.* at 767).  The June 2014 form reflected opinions nearly identical to those expressed in the August 2012 form, except

11

that in June 2014 Dr. Duritsch did not respond to whether Plaintiff could use the stairs,

but he checked "none" for "Shoulder – Reach Above" (previously, he indicated

"occasionally" for both).  (*Id.*)

> e.  <u>Robert McCarthy, M.D.</u>

Treating physician Robert McCarthy, M.D., saw Plaintiff on no less than eight

occasions from March 2010 through November 2011.  (Doc. 7, PageID ## 702-43).

During this time, Dr. McCarthy's treatment notes consistently indicate that Plaintiff has

"normal strength and tone" in her left and right, upper and lower extremities.  (*Id.* at 705,

710, 713, 716, 719, 722, 739, 742).  In March 2010, April 2011, and May 2011, Dr.

McCarthy noted that Plaintiff is experiencing joint pain in her left elbow.  (*Id.* at 712,

715, 741).  Regardless, Dr. McCarthy's notes from <u>all</u> of Plaintiff's appointments indicate

under 'musculoskeletal system review':  "<u>Not Present</u> – Decreased Range of Motion,

Joint Redness, Joint Stiffness, and Muscle Weakness."  (*Id.* at 704, 709, 712, 715, 718,

721, 738, 741) (emphasis added).

On May 12, 2010, <u>prior to Plaintiff's alleged onset date</u>, Dr. McCarthy completed

a healthcare provider's certification form for Plaintiff's leave request under the Family

and Medical Leave Act, in which he opined that Plaintiff's unspecified condition

rendered her "incapacitated" from April 22, 2010 through April 30, 2010.  (*Id.* at 645).[7]

Again on February 23, 2011, <u>prior to the alleged onset date</u>, Dr. McCarthy completed a

---

[7] Erroneously included in the record is a "Disability Verification" form, in which Dr. McCarthy opines that <u>another patient, *not Plaintiff*</u>, was under a disability, as defined in 42 U.S.C. § 423. (Doc. 7, PageID ## 647-49).  As this assessment <u>does not refer to Plaintiff</u>, her reliance on this opinion is misplaced, and the Court excludes this evidence from consideration.

second healthcare provider's certification form, stating that Plaintiff may be "incapacitated" for an unknown period of time, due to a fall which injured her *right* side, but that the injury would <u>not</u> cause flare-ups preventing the performance of her job duties.  (*Id.* at 590-93).

Less than three months later, on May 11, 2011, Dr. McCarthy completed a third healthcare provider's certification form, stating that Plaintiff was experiencing "*left* elbow pain, decreased range of motion, joint redness, stiffness, and muscle weakness," which impairments commenced on February 18, 2011 (prior to the alleged onset date) and were <u>expected to last only two to three months</u> (until April or May 2011), during which time, Plaintiff may experience flare-ups, which could prevent her from performing her job duties approximately once per month.  (*Id.* at 583-586) (emphasis added).  In contrast, however, Dr. McCarthy's treatment notes from that same timeframe (*i.e.*, April 26, 2011 and May 19, 2011) indicate only left elbow pain, and otherwise indicate normal strength and tone, and specifically state that "decreased range of motion, joint redness, joint stiffness, and muscle weakness," (*i.e.*, the <u>precise</u> impairments he listed in the May 11, 2011 healthcare certification form) were "<u>not</u> present."  (*Id.* at 712-717) (emphasis added).

On May 17, 2011, Dr. McCarthy completed a "Statement of Functionality" form at the request of The Hartford (presumably related to disability insurance), in which he opined that Plaintiff is able to frequently, and without restrictions, bend at the waist, kneel, crouch, drive, reach at any level (bilaterally), and finger/handle (bilaterally).  (*Id.* at 580).  The only limitation indicated was that Plaintiff could not lift/carry more than ten

pounds with her left hand.  (*Id.*)  However, this restriction was limited in duration and

ended on April 27, 2011.  (*Id.*)  Dr. McCarthy also opined that Plaintiff had no

psychiatric or cognitive impairments.  (*Id.*)

Subsequent notes from July 27, 2011 and November 22, 2011, indicate normal

bilateral strength, tone, and range of motion and, further, make no mention of pain

evident upon examination.  (*Id.* at 709-10).

### f.  Brenda Wills, C.N.P.

Brenda Wills, a certified nurse practitioner at Dr. McCarthy's office, completed a

physical capacities assessment on March 14, 2014.  (Doc. 7, PageID ## 1038-1042).  Ms.

Wills opined that Plaintiff could lift/carry no more than ten to fifteen pounds occasionally

or ten pounds frequently; could stand/walk for a total of less than one hour at a time

without interruption, for a total of approximately two hours in an eight-hour workday;

and could sit no more than one hour at a time and only for two hours per day.  (*Id.* at

1039).  Ms. Wills further opined that Plaintiff could never climb, balance, stoop, crouch,

kneel, or crawl, and that Plaintiff's ability to see, speak, reach, handle, finger, feel, push,

and pull, were also affected.  (*Id.* at 1040).  She also indicated that Plaintiff cannot be

exposed to heights, moving machinery, chemicals, temperature extremes, vibration, dust,

fumes, and humidity.  (*Id.* at 1041).  Ms. Wills concluded that Plaintiff lacked the

physical and emotional ability to perform light or even sedentary work.  (*Id.* at 1041-42).

Ms. Wills also prescribed a handicapped placard on March 14, 2014, which indicated that

Plaintiff was unable to walk more than 200 feet.  (*Id.* at 1036).

However, office notes from Ms. Wills dated immediately prior to her completing the March 2014 physical capacities form (*i.e.*, from November 12, 2013, January 29, 2014, March 14, 2014) indicate tightness in Plaintiff's trapezius; no myalgias; significant improvement in back pain since breast reduction surgery; some unspecified limitations in movement but able to move all extremities equally and symmetrically; ability to flex elbows, wrists, and fingers; slow but steady gait; bilateral paresthesia (*i.e.,* 'pins and needles' sensation); no difficulty with speaking or articulating logical thoughts; occasional blurry vision; occasional difficulty breathing with exertion; depression; anxiety; no panic attacks; and insomnia. (*Id.* at 1022-35).

g.   Abraham Mikalov, M.D. and Dimitri Teague, M.D.

On May 13, 2013, Abraham Mikalov, M.D., completed a physical RFC assessment at the time of initial review, opining that Plaintiff was capable of lifting and/or carrying (including upward pulling) up to twenty pounds occasionally and ten pounds frequently; could stand and/or walk (with normal breaks) for a total of six hours during an eight hour workday; could sit (with normal breaks) for a total of six hours during an eight hour workday; and could otherwise push and/or pull (including operation of hand and/or foot controls) without limitation. (Doc. 7, PageID # 147). Further, Dr. Mikalov opined that Plaintiff could never climb ladders, ropes, or scaffolds; could frequently stoop, kneel, crouch, and crawl; and could balance, and climb ramps and stairs without limitation. (*Id.* at 147-48). Additionally, Dr. Mikalov noted that Plaintiff had no manipulative, visual, communicative, or environmental limitations. (*Id.* at 148).

On September 11, 2013, Dimitri Teague, M.D., completed a physical RFC assessment on reconsideration.  (*Id.* at 175-77).  Dr. Teague concurred with Dr. Mikalov's opinion in all respects, except that he imposed an additional limitation of only occasional left and right overhead reaching.

### 2. *Mental Impairments*

#### a.  Alan R. Boerger, Ph.D.

On May 1, 2013, at the request of the Ohio Division of Disability Determination ("DDD"), Alan Boerger, Ph.D., examined Plaintiff and prepared a psychological evaluation regarding the presence or absence of a mental disorder and any resulting limitations in mental activities required for work.  (Doc. 7, PageID ## 678-684).  Dr. Boerger summarized Plaintiff's personal, educational, medical, behavioral health, and work histories.  (*Id.* at 678-79).  Plaintiff claimed that she was a "hyperactive child" and was placed on Ritalin and Mellaril until the age of twelve.  (*Id.* at 680).  She stated that she has experienced problems with anxiety since her childhood, but that she "has not had any panic attacks in a while and they only ever occurred just once in a while."  (*Id.* at 681).

Plaintiff stated that the last time she was in therapy was in 2000, following the sudden loss of six family members within a six month span, including her husband, mother, father, uncle, grandfather, and stepmother.  (*Id.* at 679-80).  She stated that, at that time, she was employed at the Bob Evans plant, but the loss of her family members affected her concentration and led her to quit the job.  (*Id.* at 680).  Other than that, Plaintiff "said she did not believe her mental health problems were an issue at work."

16

(*Id.*)  Plaintiff claimed she has never been fired and that she does "pretty good" in terms of getting along with others at work.  (*Id.*)

In terms of activities of daily living, Plaintiff stated that she wakes up by 7:30 a.m. and has coffee in the kitchen, although her mind tends to race.  (*Id.*)  She stated that she tries to clean the house and that she does laundry.  (*Id.*)  Further, Plaintiff claimed that she does not drive very much because she "can't turn [her] neck and [her] arms get numb."  (*Id.*)

With regard to public interactions and dealing with others (*e.g.*, while shopping at the store), Plaintiff stated that she can "zone into what [she is] doing."  (*Id.*)  Further, Plaintiff stated that while she was working, she used to "go to stores and do all the things she wanted to at home," and that "she was very independent then."  (*Id.*)  However, she claims that her activity level has decreased since her alleged onset date.  (*Id.*)  Regardless, Plaintiff told Dr. Boerger, "I have notebooks of everything I need to do and my calendar."  (*Id.* at 682).

Dr. Boerger noted that Plaintiff's "[s]peech and thought processes were appropriate, relevant and coherent."  (*Id.* at 681).  Further, he wrote that Plaintiff "was alert and oriented to time, place and person," but that she claims to "have some problems with her memory."  (*Id.* at 682).  Dr. Boerger stated that Plaintiff was aware of her health and emotional difficulties.  (*Id.*)  Ultimately, Dr. Boerger diagnosed Plaintiff with Anxiety Disorder (not otherwise specified) and Major Depressive Disorder, Single

17

Episode, Moderate.  (*Id*.)  He also assigned Plaintiff a Global Assessment of Functioning

("GAF") score of 53 (current).[8]

> Dr. Boerger provided the following "Summary & Conclusion":
>
> [Plaintiff] appears to have longstanding problems with anxiety which
> appear to date back to childhood which involved a very dysfunctional
> family life, placement in group homes and being a victim of abuse.  There
> also appear to be problems with chronic depression dating back to a period
> of time around 2000-2001 when she experienced the deaths of 6 close
> family members.

(*Id*. at 683).  Further, Dr. Boerger opined that due to "the longstanding nature of

[Plaintiff's] emotional difficulties along with the presence of ongoing situational

stressors, symptoms are likely to continue for the indefinite future."  (*Id.*)

> Dr. Boerger's evaluation concluded with a functional assessment which stated that

Plaintiff reports problems with forgetfulness in day-to-day activities and therefore she

keeps a calendar and notebooks to remind herself to complete daily tasks.  (*Id.*)  Plaintiff

was able to recall two of four objects after five minutes and could recall six digits

forward and three backward.  (*Id.*)  Further, Plaintiff reported problems with

concentration in the form of racing thoughts and doing multiple projects at once, and Dr.

Boerger observed that "[i]n performing Serial 7's she used her fingers and made 6

subtraction errors."  (*Id.*)

---

[8] A GAF score is used to report a clinician's judgment as to a patient's overall level of
psychological, social, and occupational functioning.  <u>DSM-IV-TR Classification Appendix</u>,
available at:  http://wps.prenhall.com/wps/media/objects/219/225111/CD_DSMIV.pdf.  The
GAF scale ranges from 0 to 100, divided into ten-point increments, with a lower score indicating
greater symptom severity and difficulty functioning.  *Id.*  A GAF score between 50 and 60
reflects:  "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic
attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends,
conflicts with peers or co-workers)."  *Id.*

Dr. Boerger stated that Plaintiff "related [to him] in an appropriate manner." (*Id.*) Plaintiff "d[id] report some problems with buildup of anger and temper outbursts." (*Id.*) However, she also stated that "[s]he did not think she had difficulty relating to others in work situations." (*Id.*) Dr. Boerger opined that Plaintiff's "longstanding problems with anxiety and depression are likely to limit her ability to tolerate work pressures in the work situation." (*Id.* at 684).

> b. <u>Irma Johnston, Psy.D.</u>

On May 10, 2013, State agency psychologist Irma Johnston, Psy.D., conducted an initial review of the medical evidence and opined that Plaintiff has <u>*no* limitation</u> in terms of: understanding or memory; ability to sustain an ordinary routine without special supervision; ability to make simple work-related decisions; ability to ask simple questions or request assistance; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; ability to be aware of normal hazards and take appropriate precautions; and ability to set realistic goals or make plans independently of others. (Doc. 7, PageID ## 148-50).

Dr. Johnston further opined that Plaintiff is <u>*not* significantly limited</u> in her ability to: carry out both very short and simple instructions, as well as detailed instructions; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and travel to unfamiliar places or use public transportation. (*Id.* at 149-50).

Finally, Dr. Johnston opined that Plaintiff is only <u>moderately limited</u> in her ability to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting. (*Id.*)

Dr. Johnston summarized that Plaintiff is "limited to 1-2 step tasks … [and] would do best in positions without strict production standards or fast pace." (*Id.* at 149). Additionally, she stated that Plaintiff is "capable of interactions with the general public, supervisors and coworkers." (*Id.*) Finally, Dr. Johnston indicated that Plaintiff "would work best in a static, low stress job environment, with few changes." (*Id.* at 150).

### c. Todd Finnerty, Psy.D.

On September 11, 2013, State agency psychologist Todd Finnerty, Psy.D. reviewed the medical evidence on reconsideration. (Doc. 7, PageID ## 178-79). Dr. Finnerty's opinion differed slightly from Dr. Johnston's, in that he found Plaintiff's impairments to be more limiting in certain areas. Specifically, Dr. Finnerty found that Plaintiff was <u>not significantly limited</u> in her ability to: sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others. (*Id.*) Further, Dr. Finnerty found that Plaintiff was <u>moderately limited</u> in her ability to: interact appropriately with

20

the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*) Dr. Finnerty summarized that Plaintiff can "sustain a static set of tasks without fast pace[,] … interact with others superficially[, and] … adapt to a static setting without frequent changes." (*Id.*)

### B. The Administrative Hearing

#### 1. *Plaintiff's Testimony*

Plaintiff testified that she has a driver's license, but is unable to drive because of pain in her left arm and also due to her heart medication. (Doc. 7, PageID # 101). Plaintiff testified that she held several jobs over the years until she injured her upper left extremity. (*Id.* at 102-107). As a result of the injuries, she had surgery, shots, physical therapy, and uses a TENS unit. (*Id.*) However, she testified that she is "not getting any better at all." (*Id.* at 108).

Plaintiff testified that she experiences symptoms of pain all over her upper body, including the shoulders and neck, and that she was prescribed pain medication, including Neurontin and Meloxicam. (*Id.* at 107-12). (*Id.*) She claims that she is in constant pain, which she rates at a four out of ten on good days, and an eight out of ten on bad days. (*Id.* at 109, 115). Plaintiff estimated that she could lift five pounds, but stated that she could not lift a gallon of milk. (*Id.*) She has trouble handling zippers and buttoning blouses or shirts with either hand. (*Id.* at 110). Plaintiff also stated that she has limited range of motion in her neck. (*Id.* at 117). Further, she stated that she cannot get out of bed three or four days a week. (*Id.* at 116).

21

Additionally, Plaintiff testified that she has heart problems.  (*Id*. at 136-137).  She stated that, as a result of too much blood flow in her legs, she has low blood pressure and a rise in heart rate, which causes fatigue, fluttering, and chest pains.  (*Id*. at 137).  She was also prescribed medication for this condition, which she claims is not working.  (*Id*.)  Plaintiff is also on medication for her asthma, and states that she has asthma attacks once in a while, particularly in the summer.  (*Id.* at 119).

Plaintiff also testified that she suffers from anxiety and depression.  (*Id*.)  She was prescribed Zoloft and Protriptyline; however, the medications cause fatigue.  (*Id*. at 111).

With regard to her daily activities, Plaintiff testified that she wakes up in the morning, has coffee, and sits at the kitchen table for approximately two hours before she is motivated to do anything.  (*Id.* at 113).  Once she gets up, she typically does dishes, prepares simple meals, and does laundry, although she has trouble bending down to get clothes out of the dryer.  (*Id.*)  Further, Plaintiff stated that her only hobby is playing computer games, and that she is able to sit at the computer for an hour at a time before having to get up to stretch her back.  (*Id.*)

### 2. The VE's Testimony

Vocational expert Karen L. Schneider testified at the hearing, responding to several hypotheticals posed by both the ALJ and Plaintiff's counsel.  (Doc. 7, PageID ## 119-36).  The most restrictive of the ALJ's hypotheticals involved an individual limited to the following: light, unskilled work that is simple and routine; lifting and carrying no more than ten to fifteen pounds; standing or walking two hours during the day but for less than one hour without interruption; sitting six hours during the day but no more than four

hours at a time; need to alternate positions between sitting and standing at intervals of two hours; cannot balance, climb, crouch, kneel, or crawl; can only turn the neck to either side to about twenty degrees; fingering only occasionally; and needs to avoid dust, fumes, or environmental contaminants.  (*Id.* at 127-28).  The VE testified that there were jobs in the national and regional economy that could be performed by an individual restricted to the ALJ's hypothetical.  (*Id.* at 128).

In response to Plaintiff's counsel's hypothetical, the VE testified that an individual who had no use of her non-dominant arm, and could use her dominant hand for occasional fingering and handling only, would not be able to perform any of the light or sedentary jobs available in the regional or national economy.  (*Id.* at 129-31).  The VE also responded that an individual who, due to chronic pain, would be off-task as much as one-third of the workday would not be able to sustain competitive employment at any exertional level.  (*Id.* at 136).

### C.  The ALJ's Decision

The ALJ provided a complete recitation of the medical evidence, including a detailed summary of the findings from Plaintiff's treating, examining, and non-examining sources.  (Doc. 7, PageID ## 78-87).  Ultimately, the ALJ gave significant weight to the opinions of the DDD reviewing physicians, Drs. Mikalov and Teague, in terms of Plaintiff's physical impairments.  (*Id.* at 84).  With regard to Plaintiff's mental impairments, the ALJ gave partial weight to Drs. Boerger and Finnerty, and great weight to Dr. Johnston.  (*Id.* at 87).  All other sources were given little weight, both in terms of physical and mental impairments.  (*Id.* at 85-87).

## IV.  ANALYSIS

### A.  The ALJ Did Not Err in Weighing Medical Source Opinions

First, Plaintiff argues that the ALJ failed to adhere to the Social Security Administration's ("SSA") regulatory requirements for weighing medical opinions and therefore erroneously concluded that Plaintiff's treating sources' opinions were not due controlling weight.  (Doc. 8 at 10-17).  Specifically, Plaintiff alleges that the ALJ "applied rigorous scrutiny to the treating source opinions while applying none to the non-examining State agency opinions," in contravention of the SSA's rules and regulations. (*Id.*)  Plaintiff claims that, as a result, the ALJ erroneously concluded that the opinions of Plaintiff's treating physicians were "speculative" and "unsupported," while giving significant weight to the opinions of non-examining physicians, whose reviews of the record pre-dated significant events in Plaintiff's medical history.  (*Id.*)  In response, the Commissioner states that the ALJ's finding that Plaintiff's treating sources were entitled little weight was based upon a sound and thorough analysis of the record, and was appropriately articulated in her decision.  (Doc. 11 at 4-5).  This Court agrees.

"Regardless of its source, [the ALJ must] evaluate every medical opinion [she] receive[s]," in order to determine whether a claimant is disabled.  20 C.F.R. § 1527(b), (c).  However, "not all medical sources need be treated equally."  *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 642 (6th Cir. 2013) (internal quotation marks and citations omitted).  The Regulations require that a treating doctor's opinion be given "controlling weight" as long as it is "well-supported" by objective evidence and is "not inconsistent with the other substantial evidence."  20 C.F.R. § 1527(d)(2).  Greater weight is generally

given to the opinions of treating sources because treating physicians can provide a

detailed, longitudinal picture of a claimant's medical impairments and may bring a

unique perspective to the medical evidence that cannot be obtained from reports of

individual examinations (*e.g.*, consultative examinations) or from objective findings

alone. *Id.* Accordingly, less weight is given to non-treating and, certainly, non-

examining sources. *Id.*

However, '[i]t is an error to give an opinion controlling weight simply because it

is the opinion of a treating source if it is not well-supported by medically acceptable

clinical and laboratory diagnostic techniques or if it is inconsistent with the other

substantial evidence in the case record.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399,

406 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2,

1996)). "If the opinion of a treating source is not accorded controlling weight, an ALJ

must apply certain factors – namely, the length of the treatment relationship and the

frequency of examination, the nature and extent of the treatment relationship, the

supportability of the opinion, consistency of the opinion with the record as a whole, and

the specialization of the treating source – in determining what weight to give the

opinion." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (discussing

20 C.F.R. § 1527(d)(2)).

If, upon consideration of the § 1527 factors, the ALJ rejects the opinion of a

treating physician, she must articulate "good reasons" for doing so. *Wilson*, 378 F.3d at

544. "The requirement of reason-giving exists, in part, to let claimants understand the

disposition of their cases … [but] also ensures that the ALJ applies the treating physician

25

rule and permits meaningful review of the ALJ's application of the rule." *Id.* at 544-45 (internal quotation marks and citations omitted).  In particular, the ALJ's decision must articulate the "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (July 2, 1996).  Notably, the ALJ's duty to properly articulate 'good reasons' is so significant that, "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

Here, the ALJ found that the opinions of Drs. Duritsch and McCarthy were not entitled to controlling or deferential weight under the Regulations.  (Doc. 7, PageID # 86).[9]  The ALJ stated that "[a]lthough Dr. Duritsch is a rehabilitation physician and Dr. McCarthy has been [Plaintiff's] primary care physician for several years, [she] gives little weight to their assessments as they are speculative, unsupported, and conclusory."  (*Id.*)  Specifically, having previously detailed the treating source opinions, the ALJ explained

---

[9] The ALJ stated that her reasoning was equally applicable to the opinion of Brenda Wills, C.N.P., even though Ms. Wills is not an "acceptable medical source" pursuant to 20 C.F.R. §§ 404.1513 and 416.913, as Ms. Wills' opinion was entitled to consideration under the criteria set forth in SSR 06-03p, which parallels the criteria for weighing medical source opinions.  (Doc. 7, PageID # 86).

in sum that the "findings documented in the treating notes … generally included only limited range of motion, tenderness, and some decreased sensations," and that Plaintiff's "[g]ait was relatively normal, and strength in the extremities was almost consistently normal."  (*Id.*)  Thus, the ALJ found that the treating sources' opinions, essentially limiting Plaintiff to sedentary work, "seem[ed] based on subjective complaints," as they were "unsupported by the preponderance of the observable clinical signs and objective findings of the record."  (*Id.*)

In support of her determination that the treating source opinions were not entitled to controlling or deferential weight, the ALJ provided a <u>detailed and comprehensive</u> recitation of Plaintiff's medical history.  (*Id.* at 78-86).  In doing so, the ALJ drew attention to inconsistencies in the examination notes of Plaintiff's treating and examining physicians.  Significantly, the ALJ's decision shows that the opinions are not only inconsistent with each other, but are also internally inconsistent.  (*Id.* at 86-87).  In other words, the treating physicians' own notes over the years undermine the level of severity that the physicians ultimately expressed when completing Plaintiff's disability assessment forms.  The ALJ found that the treatment notes indicate historically that Plaintiff responded well to surgery and, most significantly, that Plaintiff herself told her physicians repeatedly that she was improving and experiencing less pain.  Accordingly, the ALJ determined that Plaintiff's treating physicians' opinions were not due controlling or deferential weight, as they were not well-supported and were inconsistent with other substantial evidence.

Further, in accordance with the SSA's rules and regulations, upon determining that the treating sources' opinions were not entitled to controlling weight, the ALJ appropriately considered the applicable factors to determine what weight, if any, those opinions were due.  (*Id.* at 85-87).  This analysis was thoroughly articulated in the ALJ's decision.  (*Id.* at 78-87).  Accordingly, the ALJ adhered to the SSA's regulatory requirements for determining the weight to be given to treating source opinions, and for explaining this determination in her decision.

Additionally, Plaintiff's argument that the ALJ applied rigorous scrutiny to the treating source opinions while applying no scrutiny to the non-examining source opinions is not well-taken.  The ALJ thoroughly considered all of the record evidence and found that the treating source opinions were neither well-supported, nor consistent with other substantial evidence.  On the other hand, the ALJ found that the non-examining sources were due greater weight, "as their assessments [we]re generally supported by objective signs and findings in the preponderance of the record."  (*Id.* at 84).  In short, the ALJ's determination was based upon a thorough review of the medical evidence, and was not tainted by an improper application of scrutiny.

It also bears noting that Plaintiff largely overstates the severity that her treating physicians expressed in their opinions.  Indeed, while Plaintiff alleges that her treating physicians opined that she is 'disabled,' a careful review of the record, as summarized *supra*, reveals that many of those findings were <u>very</u> limited in duration and pre-dated the alleged onset date.  Plaintiff's arguments also fail to recognize the inconsistencies in the opinions when read chronologically.  Additionally, the fact that the record reflects

28

evidence of severe impairments does not necessitate a finding of disability.  Plaintiff's

medical evidence supports finding certain limitations, to which the ALJ was responsive.

However, having engaged in a thorough and appropriate analysis, the ALJ determined

that the evidence does not support the severity Plaintiff alleges, and this Court finds no

basis to disturb that finding.

Plaintiff also argues that the ALJ erred by deferring to non-examining source

opinions "because there is no indication in the record that the non-examining State

agency reviewers had access to the entire medical record and a chance to observe

[Plaintiff] during the administrative hearing."  (Doc. 8 at 16).  However, this argument

misrepresents the relevant case law.  Specifically, the ALJ may still rely on non-

examining source opinions even if they pre-date significant medical development, as long

as, in doing so, she indicates that she first considered the subsequent medical evidence.

*Brooks*, 531 F. App'x at 642 ("[w]hen an ALJ relies on a non-examining source who 'did

not have the opportunity to review' later submitted medical evidence, … we generally

require 'some indication that the ALJ at least considered these [new] facts before giving

greater weight to an opinion that is not based on a review of a complete case record'"

(quoting *Blakley*, 581 F.3d at 409)).

Here, the ALJ thoroughly considered the entire record, including notes and

opinions developed after the non-examining sources' reviews.  Indeed, the ALJ

specifically states that the non-examining source opinions were due greater weight

because they were, "generally supported by objective signs and findings in the

preponderance of the record, <u>including the records submitted after their assessments</u>."

(Doc. 7, PageID # 84) (emphasis added).  And, notably, the ALJ incorporated limitations in Plaintiff's RFC based upon subsequent opinions, thus evidencing that she not only considered those subsequent opinions, but was responsive to their content.

Accordingly, this Court finds no error in the ALJ's consideration of the medical evidence and concludes that the ALJ engaged in an appropriate analysis, in line with the SSA's rules and regulations.

### B.  The ALJ Committed No Error in Evaluating Plaintiff's Credibility, Pain, and Symptoms

Next, Plaintiff argues that the ALJ's erred in evaluating her credibility, pain, and symptoms by relying on improper factors.  (Doc. 8 at 17-19).

In making a determination of disability, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider [the claimant's] credibility." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).[10]  The Court must "accord the ALJ's determination of credibility great weight and deference particularly since the ALJ has the opportunity … of observing [the claimant's] demeanor while testifying."  *Id.*  However, to appropriately evaluate the credibility of the claimant's statements, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant

---

[10] Subjective complaints may "support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record."  *Jones*, 336 F.3d at 475-76.

evidence in the case record." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *1 (July 2, 1996).

The ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight … [given] to the individual's statements and the reasons for that weight." *Id.*, at *2. Indeed, "'[i]t is more than merely 'helpful' for the ALJ to articulate reasons ... for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review.'" *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (quoting *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

"One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p, at *5. "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citations omitted). However, "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, at *1.

Here, Plaintiff asserts that the ALJ erred by relying on Plaintiff's failure to pursue mental health treatment, as a basis for doubting her credibility. (Doc. 8 at 17-18). Indeed, "it is a questionable practice to chastise one with a mental impairment for the

exercise of poor judgment in seeking rehabilitation." *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). However, the ALJ did not rely solely on Plaintiff's lack of mental health treatment as a basis to discredit her allegations. Rather, the ALJ began by citing to specific treatment notes indicating that Plaintiff's complaints regarding her mental health were inconsistent. (Doc. 7, PageID ## 83-84). The ALJ stated that Plaintiff's "treating and examining physicians documented relatively normal mental status examinations on several occasions throughout the record." (*Id.* at 83-84). In other words, even without treatment or regular compliance with her prescribed medication, Plaintiff's mood and affect were often normal. The ALJ's comment that Plaintiff's "limited mental health treatment casts doubt on [her] allegations about the severity of the symptoms she experienced," was not a final or determinative factor in her credibility assessment, but rather, further evidence of inconsistency. (*Id.*)

Additionally, Plaintiff alleges that her "ability to perform [] basic daily activities is not substantial evidence that her symptoms are not disabling." (Doc. 8 at 17). Plaintiff is accurate in stating that minimal daily functions (*e.g.*, driving, reading, cleaning, watching television, etc.) are not comparable to typical work activities. *See, e.g., Rogers,* 486 F.3d at 248-49. However, daily activities, while not dispositive, are a proper consideration and may show that a claimant's symptoms are not as limiting as alleged. 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(2)(i); *see Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (an ALJ may "consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments").

In the instant case, the ALJ did not discredit Plaintiff's allegations merely because Plaintiff engaged in minimal activities of daily living. Rather, Plaintiff's statements regarding her daily activities directly contradicted and significantly undermined the medical opinions on which she relied to show the severity of her impairments. For example, at the administrative hearing, Plaintiff alleged that she is "unable to perform even sedentary work full-time." (Doc. 7, PageID ## 99-100). In support of this assertion, Plaintiff relied on the opinion of treating source, Brenda Wills, C.N.P., who opined that Plaintiff was only able to sit for <u>less than one hour at a time</u> without interruption, and for no more than <u>two hours total in one day</u>. (*Id.* at 99-100, 1049). However, shortly thereafter, Plaintiff actually testified that she typically wakes up in the morning and "sit[s] at the kitchen table for a <u>couple of hours</u>." (*Id.* at 113) (emphasis added). Further, she testified that after sitting for a couple of hours to "get [her]self motivated," she begins doing dishes, laundry, cooking simple meals for the family, and playing computer games. (*Id.* at 113-14). Additionally, with regard to playing on the computer – which Plaintiff referred to as her only hobby – she stated that she is able to sit at the computer for <u>an hour at a time</u> before she has to get up and stretch her back, with no indication that she is physically limited to two hours per day. (*Id.* at 114-15).

In sum, the ALJ did not rely on Plaintiff's statements regarding her daily activities as substantial evidence that Plaintiff is not disabled. Instead, the ALJ considered Plaintiff's admitted daily activities in determining the credibility of her allegations of severity and her physicians' opinions regarding physical limitations. Such consideration of daily activities for purposes of evaluating symptoms is appropriate and, accordingly,

the ALJ did not err in her assessment.  *See* 20 C.F.R. §§ 404.1529(c)(3)(i) and 416.929(c)(2)(i).

### C.  The Commissioner Did Not Fail to Carry Her Step Five Burden

Finally, Plaintiff argues that the Commissioner failed to carry her burden at Step Five of the sequential evaluation.  (Doc. 8 at 19-20).  Specifically, Plaintiff argues that the ALJ's determination that Plaintiff was capable of performing jobs existing in the national and regional economy was erroneous because the ALJ failed to account for the limitations imposed by Plaintiff's mental impairments, as set forth in Dr. Finnerty's evaluation.  (*Id.*)  Accordingly, Plaintiff alleges that the ALJ's Step Five determination is not supported by substantial evidence.  (*Id.* at 20).

The SSA uses a five-step sequential evaluation process in order to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a).  The claimant bears the burden of proof through the first four steps.  *Jones*, 336 F.3d at 474.  However, at step five, the burden shifts to the Commissioner to show that, given the claimant's RFC, age, education, and work experience, she is capable of making an adjustment to other work that exists in significant numbers in the national or regional economy.  *Id.*; 20 C.F.R. §§ 404.1520(a)(4)(v) and 404.1560(c).

To meet the burden at step five, "the Commissioner must make a finding supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (internal quotation marks and citations omitted).  "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a

'hypothetical' question, but only 'if the question accurately portrays [Plaintiff's] individual physical and mental impairments.'" *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).

However, "[t]he rule that a hypothetical question must incorporate all of the claimant's physical and mental limitations does not divest the ALJ of his or her obligation to assess credibility and determine the facts." *Griffeth*, 217 F. App'x at 429 (internal quotation marks and citations omitted). "[T]he ALJ can present a hypothetical to the VE on the basis of [the ALJ's] own assessment if [s]he reasonably deems the claimant's testimony to be inaccurate." *Jones*, 336 F.3d at 476. Indeed, "it [is] entirely proper for the ALJ to present the [VE] with [a] hypothetical [s]he constructed, which [does] not reflect [the claimant's] complaints … [if] the hypothetical [is] supported by substantial evidence in the record." *Id.* at 477-78. Regardless of whether "substantial evidence, or even a preponderance of the evidence, supports the claimant's position," "the Commissioner's decision cannot be overturned … so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* at 477. Thus, on review, the Court must determine only whether the ALJ's determination was reasonable and supported by substantial evidence. *Id.* at 476.

Here, the ALJ gave partial weight to Dr. Finnerty's opinion, which indicated that Plaintiff is capable of sustaining a static set of tasks involving no fast pace and no frequent changes. (Doc. 7, PageID # 87). However, the ALJ found that Dr. Finnerty's opinion that Plaintiff was moderately restricted in social functioning and limited to only

superficial interactions with others, was not credible.  (*Id.*)  In support of her conclusion, the ALJ stated that "[t]he record does not reveal significant problems with social functioning," and that "[Plaintiff] admitted to the consultative examiner that she did not think that she had difficulty relating to others in work situations, and the consultative examiner indicated that the claimant related in an appropriate manner."  (*Id.*)

Moreover, the ALJ had previously noted numerous occasions in which Plaintiff's physicians, as well as consultative examiner Alan R. Boerger, Ph.D., and reviewing psychologist Irma Johnston, Psy.D., noted that Plaintiff had no issues with social interaction.  (*Id.* at 77-87.)  Of even greater significance, however, is the thorough explanation that Plaintiff herself provided regarding her social activities, which the ALJ took note of in her decision.  (*Id.* at 79.)  Specifically, in addition to telling Dr. Boerger that she did not have trouble relating to others, Plaintiff completed the SSA's Function Report and wrote that she has friends who take her out, that she socializes with others on a daily basis, and that she has no problems getting along with family, friends, and neighbors.  (*Id.* at 315-17.)  Indeed, in marking the checkboxes correlating to the limitations imposed by her alleged impairment, the only boxes that Plaintiff did *not* check were "Talking," "Hearing," and "Getting Along With Others."  (*Id.* at 317.)

In short, the ALJ's reasons for partially discrediting Dr. Finnerty's opinion, and her determination that Plaintiff has no significant difficulty interacting with others, including the general public, supervisors, and coworkers, is both reasonable and supported by substantial evidence in the record.  (*Id.* at 87.)  Accordingly, the ALJ was entitled to modify her hypothetical so as to reflect her assessment of Plaintiff's *credible*

36

impairments, and the VE's testimony in response to the ALJ's hypotheticals serves as substantial evidence.  Therefore, the Commissioner met her Step Five burden.

## V.  CONCLUSION

Based upon the foregoing, this Court believes that the ALJ did not err in her determination and that substantial evidence supports the ALJ's findings at each step of the sequential evaluation, including her ultimate decision that Plaintiff was not disabled under the Act.

### IT IS THEREFORE RECOMMENDED THAT:

1.  The Commissioner's non-disability finding be AFFIRMED; and

2.  The case be terminated on the docket of this Court.

Date:  2/1/2016 _____                     _____
                                                                *s/ Sharon L. Ovington*
                                                                Sharon L. Ovington
                                                                Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).